UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT

Hans Knauss,                          :
     Plaintiff,                       :
                                      :
v.                                    :
                                      :
Ultimate Nutrition, Inc.; and         :
Does 1 through 30, inclusive,         :
     Defendant.                       :
_____        :
                                      :   Case No. 3:06cv842 (JBA)
                                      :
Ultimate Nutrition, Inc.; and         :
Does 1 through 30, inclusive,         :
     Third-Party Plaintiffs,          :
                                      :
v.                                    :
                                      :
AMT Labs, Inc.,                       :
     Third-Party Defendant.           :


**RULING ON THIRD-PARTY DEFENDANT'S MOTION TO DISMISS FOR LACK OF
         JURISDICTION AND IMPROPER VENUE [DOC. # 31]**

In this diversity action, plaintiff Hans Knauss, a former Olympic silver medalist alpine skier and "superstar in Austria and around the world," was bound for the Olympic Games in Torino, Italy when he was suspended from competition after testing positive for banned substances. His complaint claims that these test results were caused by his unwitting consumption of nutritional supplements containing norandrostenedione, a steroid. (Am. Compl. [Doc. # 44] ¶¶ 9, 12, 13, 23.) As a consequence, Mr. Knauss was unable to compete at the Olympics, allegedly resulting in his humiliating losses of endorsements,

                                  1

sponsorships, and income, and a permanently tarnished reputation. (Id. at ¶¶ 18, 26.) Mr. Knauss has brought this action against defendant/third-party plaintiff Ultimate Nutrition, Inc. ("UNI"), the manufacturer of the "Super Complete" nutritional supplement he consumed, for damages resulting from his eighteen-month suspension from skiing competition. (Id.)

UNI in turn has sued AMT Labs, Inc. ("AMT") as a third-party defendant. UNI alleges that AMT's premix, which was supplied to and used by UNI to make the Super Complete capsules, contained the norandrostenedione. (Third Party Compl. [Doc. # 13] ¶ 4.) UNI asserts that any liability on its part would be the result of AMT's negligence, improper manufacture, improper labeling, carelessness, culpable conduct, and/or breach of contract. (Id. ¶¶ 21-26.) UNI further claims that if it is held liable for the damages alleged in the Complaint then it is entitled to indemnification from AMT pursuant to Conn. Gen. Stat. § 52-577a. (Id. ¶¶ 20-26.)

AMT has moved to dismiss this action for lack of personal jurisdiction pursuant and for improper venue pursuant to Fed. R. Civ. P. 12(b)(2) and (b)(3). (Third-Party Def.'s Mot. to Dismiss [Doc. # 31].) For the reasons set forth below, AMT's Motion to Dismiss is denied.

## I. FACTUAL BACKGROUND

Around June 24, 2003, UNI purchased from AMT a quantity of

Super Complete premix, termed "UL Super Complete Capsules, Granular, Premix," with lot number J051306C. (Third-Party Compl. ¶ 8.) This was the third time UNI had purchased materials from AMT. (Fang Aff. [Doc. # 32-2] ¶ 11.) AMT provided a certificate of analysis to UNI with this product which did not list 19-norandrosterone or norandrostenedione as a content. (Third-Party Compl. ¶ 9.) Approximately 66.7 percent of UNI's Super Complete capsules were composed of AMT's premix. (Id. ¶ 4.) This identified lot of AMT's premix was used by UNI to produce lot number 404001 of UNI's Super Complete capsules. (Id. ¶ 11.)

In November 2004, Mr. Knauss purchased a container of Super Complete capsules from lot number 404001 and followed the directions on the label for consumption. (Am. Compl. ¶ 10.) Prior to purchasing or taking Super Complete, Mr. Knauss alleges he read literature on UNI and its products and confirmed with UNI[1] that its product was appropriate for his needs and was safe and free from any substance that would disqualify him from competition under the anti-doping regulations of the International Ski Federation ("FIS"), the World Anti-Doping Agency ("WADA"), and the International Olympic Committee ("IOC").

---

[1] On two occasions (November 18, 2003 and July 25, 2004), in response to direct inquiry from plaintiff but without having tested the Super Complete capsules, UNI allegedly affirmatively represented that "none of the products manufactured by Ultimate Nutrition contains traces of products that are on the doping list of the International Olympic Committee or the World Anti-Doping Agency." (Am. Compl. ¶¶ 12-13.)

3

(Id. ¶ 11.)

Mr. Knauss was subject to regular drug testing by FIS, WADA and the IOC. (Id. ¶ 14.) On November 27, 2004, he provided a required urine sample to compete in the FIS Alpine World Cup Downhill Competition in Lake Louise, Canada. When analyzed[2] his sample was found contaminated with the prohibited substance 19-norandrosterone, a known metabolite of norandrostenedione.[3] As a result of testing positive for a banned substance, Mr. Knauss was suspended from skiing competition for eighteen months. (Id. ¶¶ 18-22.)

In December 2004, Mr. Knauss claims he sent the container of Super Complete from lot number 404001 to Seibersdorf Research ("Seibersdorf") in Seibersdorf, Austria for analysis, which reported that it contained norandrostenedione despite the fact that the label failed to disclose that substance or any steroid or steroid precursors as ingredients. (Id. ¶¶ 23-24.) AMT allegedly admitted that it also has suppliers that produce certain steroids in AMT's facilities. (Id. ¶ 12.)

---

[2] The urine sample was analyzed in the WADA-accredited laboratory in Montreal, Canada (hereinafter "Montreal Laboratory"), which reported on December 15, 2004 that the "A" sample of Mr. Knauss's urine contained the prohibited substance of 19-norandrosterone, later confirmed by testing sample "B" of Mr. Knauss's urine. (Am. Compl. ¶ 15.)

[3] The ingestion of norandrostenedione results in the urinary excretion of 19-norandrosterone reflected as positive results in testing for the presence of banned substances. (Am. Compl. ¶ 16.)

4

Mr. Knauss alleges that his losses and damages were a result of the negligence of UNI. UNI claims, in turn, that any damages sustained by Mr. Knauss because of the alleged presence of norandrostenedione in the Super Complete capsules were caused by the contamination of AMT's premix used in those capsules.

## II. DISCUSSION

### A. Personal Jurisdiction

When responding to a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), third-party plaintiff UNI bears "the burden of establishing that the court has jurisdiction over the defendant." Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999). In ruling on a motion to dismiss, the procedural path the district court follows determines the plaintiff's burden of proof. CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 364 (2d Cir. 1986). The parties in this case have been allowed limited discovery regarding the issue of jurisdiction, but the Court declined to hold a full evidentiary hearing. In these circumstances, "the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990); see also Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560,

566-67 (2d Cir. 1996). In determining the propriety of exercising personal jurisdiction over a nonresident defendant, courts first look to whether jurisdiction is permitted under the relevant state long-arm statute, and, if so, then to whether such jurisdiction is also consistent with the Due Process Clause of the 14th Amendment. Savin v. Ranier, 898 F.2d 304, 306 (2d Cir. 1990); Lombard Bros., Inc. v. Gen. Asset Mgmt. Co., 190 Conn. 245, 250, 460 A.2d 481 (1983).

### 1. Long-arm jurisdiction

Under Connecticut law, personal jurisdiction may be exercised over a foreign corporation in a cause of action which arises out of a "contract made . . . or to be performed in" Connecticut, "the production, manufacture or distribution of goods by such corporation with the reasonable expectation that such goods are to be used or consumed in" Connecticut, or "tortious conduct in" Connecticut. Conn. Gen. Stat. § 33-929(f)(1), (3)-(4). UNI relies on these three jurisdictional bases.

#### a. Contract not made in Connecticut

AMT first argues that jurisdiction is not proper under § 33-929(f)(1) because the contract[4] between AMT and UNI was made in

---

[4] Both parties are merchants who deal in goods involved in the transaction. Conn. Gen. Stat. § 42a-2-104. The invoice that memorializes the transaction between AMT and UNI constitutes a contract. Conn. Gen. Stat. §§ 42a-2-201, 42a-2-204, 42a-2-206.

6

Utah.  Generally, in Connecticut, "a contract is considered made when and where the last thing is done which is necessary to create an effective agreement." Elec. Regulator Corp. v. Sterling Extruder Corp., 280 F. Supp. 550, 555 (D. Conn. 1968) (citing Alfred M. Best Co. v. Goldstein, 124 Conn. 597, 602, 1 A.2d 140 (1938)).  An enforceable agreement is made when contract formation is completed, i.e., when there is an offer and an acceptance of that offer.  Bridgeport Pipe Eng'g Co. v. DeMatteo Constr. Co., 159 Conn. 242, 249, 268 A.2d 391 (1970).  In the case of a bilateral contract, the acceptance of an offer need not be express but may be shown by any words or acts which indicate the offeree's assent to the proposed bargain.  Id.  Here, UNI's offer, purchase order number 030421A, was sent to AMT in Utah.  (Fang Aff. ¶ 8.)  Thereafter, AMT consented by filling the purchase order, issuing an invoice to UNI, and shipping the product.  (Id. ¶¶ 9-10.)  Because acceptance was in Utah, the contract was made in Utah, and UNI has not met its prima facie burden under this portion of the long-arm statute.

### b. Contract not performed in Connecticut

Alternatively, UNI asserts that if a contract was not made in Connecticut, it was performed in Connecticut by UNI's payment from Connecticut.  However, a single payment made from the forum state to the defendant, without more, is incidental and not substantive performance sufficient to invoke jurisdiction under

7

the second portion of § 33-929(f)(1). See, e.g., Lombard Bros., 190 Conn. at 256 (finding pursuant to the predecessor long-arm statute that because the relevant conduct was "substantially made and executed in New York [and] neither the plaintiff's preliminary transfer of funds from Connecticut nor the defendant's confirmatory sending of notices to Connecticut can alter the manner and the place that [defendant] chose to do business"); Coan v. Bell Atl. Sys. Leasing, Inc., 813 F. Supp. 929, 944 (D. Conn. 1990) (finding insufficient to establish jurisdiction the mere fact that payments were generated from Connecticut, where the defendant did not have other significant contacts with the state). Although AMT purposefully sent its product to Connecticut for the third time when it sent this premix order to UNI (Fang Aff. ¶¶ 10-11), it is undisputed that its offices are in Utah, it receives all orders and responds to those orders in Utah, it ships orders from Utah, it has never transacted business, advertised, solicited sales, maintained an office, held assets, or sent a representative to negotiate or sign a contract in Connecticut. On these facts, AMT's receipt of payment on the contract from Connecticut alone is insufficient to constitute performance of the contract in Connecticut.

   **c. Contract arose out of distribution of goods reasonably expected to be used or consumed in Connecticut**

UNI further argues that jurisdiction is proper because this

8

dispute arose "out of the production, manufacture or distribution of goods" by AMT "with the reasonable expectation that such goods are to be used or consumed in" Connecticut. Conn. Gen. Stat. § 33-929(f)(3). AMT responds that the premix solution sold to UNI does not constitute "such goods" but that it was merely raw material used by UNI to make its supplements. AMT further argues it was UNI's supplements, not its premix, that Mr. Knauss was consuming when he failed the drug test and was banned from skiing competition.

AMT relies on Goldstein v. Nutrition Now, Inc., No. X02CV 960150429S, 1999 WL 701825 at *9 (Conn. Super. Ct. Aug. 23, 1999), in support of its contention that "transactions that involve the sale and delivery of raw material rather than finished products do not give rise to a reasonable expectation of use or consumption in Connecticut." (Third-Party Def.'s Mem. in Supp. [Doc. # 32] at 7.) In that case, the court applied this portion of the long-arm statute only to foreign companies who reasonably expect that the product they create will be used or consumed in Connecticut. But Nutrition Now did not preclude long-arm jurisdiction over a foreign corporation where goods are used in Connecticut as parts of or ingredients in another product, only where that defendant's goods are so incorporated into another product as to "convert them into something new and different . . . and thus transmogrif[ied] [such that] use or

9

consumption of the new and different product cannot constitute use or consumption of the goods used to make the product." Nutrition Now, 1999 WL 701825 at *10 (quotation marks omitted). Thus, when a defendant's goods are incorporated into another product and do not lose their essential functions or characteristics, then the defendant's raw materials may constitute "such goods used or consumed" in Connecticut because, as unchanged components of the final product consumed, they retain their defective or dangerous characteristics.

Here, UNI asserts that AMT's premix solution constitutes two-thirds of UNI's Super Complete Supplement and the name of the premix — "Super Complete Capsules, granular, premix" — is the same name as the capsules made by UNI. (Third-Party Compl. ¶ 4.) From this limited record, AMT has not shown that its premix was "transmogrified" when used as the majority constituent of UNI's Super Complete supplement.

UNI must also demonstrate that AMT should have reasonably expected its premix to be used or consumed in Connecticut, i.e., that the AMT/UNI transactions put AMT on notice that it might one day be haled into court in Connecticut by someone who used the goods containing the premix and that UNI's claim against AMT is not materially different from a cause of action arising from consumer use. See Thomason v. Chemical Bank, 234 Conn. 281, 295, 661 A.2d 595 (1995); Divicino v. Polaris Indust., 129 F. Supp. 2d

425, 430 (D. Conn. 2001). Because the AMT/UNI transaction was a direct sale in which AMT's powdered premix was shipped to UNI, whose Connecticut address appears on UNI's correspondence and payment, this put AMT on notice of the possibility of a lawsuit in Connecticut arising from problems with the use or consumption of its premix product there. See, e.g., Hover v. Asbestos Corp., 678 F. Supp. 370, 374 (D. Conn. 1986) (finding jurisdiction proper where defendant lacking other significant contacts should have reasonably "expect[ed] with near certainty that its products were being used in Connecticut, and if injury resulted from the use of the products, [that it could] be named as a defendant in a Connecticut court").

Lastly, Mr. Knauss's cause of action is sufficiently similar to what might have resulted directly from a defect in AMT's premix. The premix comprised 66.7 percent of UNI's capsule sold to Mr. Knauss, who consumed them and now claims injury arising from their effects. UNI's complaint alleges that it was the defect in this steroid-tainted premix that caused the injury to Mr. Knauss. Inasmuch as the cause of action here arose from the consumption of "such goods" supplied by AMT, UNI has satisfied its prima facie obligation of showing that jurisdiction exists under § 33-929(f)(3).

### d. Cause of action arose out of tortious conduct in Connecticut

UNI further asserts that AMT should be subject to jurisdiction under § 33-929(f)(4) because of the false representations AMT transmitted to Connecticut by mail. UNI claims that around June 24, 2003, AMT shipped its premix with a certificate of analysis which did not list 19-norandrosterone or norandrostenedione among the identified contents of the premix. (Third-Party Compl. ¶ 10.) Where a defendant sends false representations into the state, jurisdiction exists under § 33-929(f)(4) because such tortious conduct is deemed to have occurred within the state. Lombard Bros., 190 Conn. at 255 (considering "the totality of defendant's conduct and connection with [Connecticut]" in determining whether to exercise personal jurisdiction "on a case by case basis"); David v. Weitzman, 677 F. Supp. 95, 98 (D. Conn. 1987) (finding jurisdiction based on defendants' telephone conversations and mail correspondence initiated from Florida containing fraudulent misrepresentations regarding the purchase price of a Florida condominium).

Applying Connecticut's long-arm statute to tort actions of this character "is consistent with the statute's remedial purpose of providing Connecticut residents" — including in this instance UNI — "with a convenient forum to seek redress for losses they suffer here as a result of a nonresident's tortious actions." Cody v. Ward, 954 F. Supp. 43, 46 (D. Conn. 1997) (citing

12

O'Connor v. O'Connor, 201 Conn. 632, 637, 519 A.2d 13 (1986). Here, AMT's certificate analysis is claimed to be such a false misrepresentation which led UNI to market its Super Complete capsules as a nutritional supplement free from any banned substances. Due to AMT's misrepresentation on the analysis, UNI alleges it was ignorant of the fact its supplements contained a banned steroid and therefore could not warn its customers. It was this unknown component of the premix which UNI claims then caused the injury claimed by Mr. Knauss. UNI has therefore established a prima facie showing of AMT's tortious conduct within Connecticut sufficient to confer personal jurisdiction over AMT under § 33-929(f)(4).

### 2. Due process

Because a prima facie showing of personal jurisdiction has been made under § 33-929(f), the Court next determines whether extending jurisdiction to this defendant satisfies the two-part test for meeting due process requirements: whether the defendant has sufficient "minimum contacts" with Connecticut "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Wash., 326 U.S. 310, 316 (1945).

### a. Minimum Contacts

At minimum, due process requires "that there be some act by which the defendant purposefully avail[ed] itself of the

13

privilege of conducting activities within [Connecticut], thus invoking the benefits and protections of its laws," <u>Hanson v. Denckla</u>, 357 U.S. 235, 253 (1958), meaning that the defendant must have taken some action "purposefully directed toward [Connecticut]," <u>Asahi Metal Indus. Co. v. Superior Court</u>, 480 U.S. 102, 112 (1987). Personal jurisdiction may be established by either specific jurisdiction (if the suit arises from the defendant's contacts with the forum) or general jurisdiction (based on defendant's "continuous and systematic" contacts with the forum state). <u>Helicopteros Nacionales de Columbia, S.A. v. Hall</u>, 466 U.S. 408, 415-16 (1984).

Here, UNI has demonstrated AMT's minimum contacts in satisfaction of due process requirements. The shipment at issue, accompanied by its certificate of analysis, was AMT's third to Connecticut to UNI; this was done with the knowledge that UNI was a Connecticut company which would use this premix in Connecticut to make Super Complete capsules for consumers and for which it received payments from Connecticut. Thus, AMT purposefully availed itself of the privileges of doing business in Connecticut and thus should have reasonably expected to be haled into court here.

### b.  Fairness

As to the second part of the due process analysis — whether the exercise of jurisdiction is fair and reasonable — a court

must consider several factors:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

Metro. Life Ins., 84 F.3d at 568 (citing Asahi, 480 U.S. at 113-14). "[D]epending upon the strength of the defendant's contacts with the forum state, the reasonableness component of the constitutional test may have a greater or lesser effect on the outcome of the due process inquiry." Id. (citing Burger King v. Rudzewicz, 471 U.S. 462, 477 (1985)).

AMT argues that none of its records, files or witnesses are located in Connecticut. Although AMT is a Utah defendant doing business in Utah and being called upon to defend an action in Connecticut, this factor cuts only slightly in its favor: modern technology and means of travel have alleviated much of the difficulty for out-of-state defendants.

In contrast, Connecticut has a substantial interest in adjudicating this personal injury claim where a Connecticut company claims it may have unwittingly produced and sold a tainted consumer product as a result of the defendant's delivery of misrepresented merchandise. Though the injury in this case was suffered by a nonresident, UNI has an interest, as a company with offices in, and operating solely out of, Connecticut, to

15

ensure that it provides a safe untainted product to consumers in this state.

In assessing the efficient administration of justice, "courts generally consider where witnesses and evidence are likely to be located." <u>Metro. Life Ins.</u>, 84 F.3d at 574.  Here, some witnesses and evidence, such as the analysis sent to UNI, will be located in Connecticut and Connecticut is the place where the alleged tort took place.  It also appears likely that other evidence and witnesses are located in Utah as well as Austria and Montreal.  Therefore, this factor does not weigh in favor of the either party.

Lastly, looking to the shared interest of the states in furthering substantive policies, neither party has suggested, much less shown, any substantive social policies that would be furthered by permitting this case to be heard in Connecticut.  Therefore, this factor does not favor either party.

With the last two factors weighing in favor of neither party, the burden which AMT would bear in litigating this action in Connecticut is outweighed by the state's stronger interest in affording UNI a convenient forum in which to obtain relief.  Thus, in sum, to exercise personal jurisdiction in these circumstances would not be contrary to "traditional notions of fair play and substantial justice."

**B. Forum-Selection Clause**

AMT has also moved to dismiss for improper venue in light of the forum-selection clause contained in the invoice sent to UNI. The "Terms and Conditions" section of the invoice reads, in relevant part: "In the event of a default, jurisdiction shall take place in the courts in Salt Lake County, State of Utah, or otherwise stated by Seller." (Invoice, Fang Aff. Ex. A.) AMT argues in response that the term "default" is broader than mere failure to pay and encompasses claims of non-conforming goods. (Third-Party Def.'s Reply [Doc. # 39] at 8.)

In general, forum-selection clauses should be enforced unless the challenging party "'clearly show[s] that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" Bense v. Interstate Battery Sys. of America, Inc., 683 F.2d 718, 721 (2d Cir. 1982) (quoting The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972)). The construction of such a clause "is a contractual question that requires the courts to interpret the clause and, where ambiguous, to consider the intent of the parties." New Moon Shipping Co. v. MAN B & W Diesel AG, 121 F.3d 24, 33 (2d Cir. 1997). Plaintiff maintains that giving the term "default" the expansive meaning urged by AMT would be contrary to the express terms of the agreement and would frustrate the intent of the parties. The "Terms and Conditions" section of the invoice

17

enumerates the obligation of the buyer to pay for the goods, the details of how and when the invoice should be paid, and what rights the seller has should the buyer fail to pay:

> Past due balances are subject to a late payment charge of 1½% per month, or if less, the maximum amount permitted by applicable law. This sales agreement is not assignable or transferable by Buyer, in whole or in part, except with the written consent of Seller. In the event that Buyer fails to fulfill the terms of payment, or in case Seller shall have any doubt at any time as to the buyer's financial responsibility Seller may decline to make further deliveries, except upon approval by Seller. Balances due must be paid in U.S. Dollars . . . . In the event of a <u>default</u>, jurisdiction shall take place in the courts in Salt Lake County, State of Utah, or otherwise stated by Seller.

(Invoice, Fang Aff. Ex. A (emphasis added).) From the position of the venue clause within the first paragraph and the fact that the remainder of the "Terms and Conditions" discusses, by paragraph, warranties, claims for damages to the goods, and liability of AMT for property or personal damage caused by the goods, it is clear that "default" refers only to the failure of the buyer to pay for the goods as promised. It is therefore unambiguous that Utah is the proper venue under the contract when there is a default in payment by UNI. But because no payment default is at issue here, Connecticut is therefore a proper venue to adjudicate this action.

## V.  CONCLUSION

For the foregoing reasons, defendant's Motion to Dismiss [Doc. # 31] is denied.

IT IS SO ORDERED.

/s/
JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 14th day of September, 2007.**